DAVID N. WOLF (6688)
LANCE SORENSON (10684)
Assistant Utah Attorneys General
OFFICE OF THE UTAH ATTORNEY GENERAL
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Office: (801) 366-0100
Direct: (801) 366-0557
E-mail: dnwolf@agutah.gov
E-mail: lancesorenson@agutah.gov

*Counsel for State Defendants*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD ASSOCIATION OF UTAH,<br><br>                          Plaintiff,<br><br>v.<br><br>RICHARD SAUNDERS, et al.<br><br>                         Defendants. | **STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00238<br><br>Judge Clark Waddoups |

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 6

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 8

   Background ...................................................................................................... 8

   The Dilation and Evacuation Method of Abortion ............................................ 8

   State's Interest in Protecting the Life of the Unborn ........................................ 11

   State's Interest in the Ethics of its Medical Profession .................................... 17

   State's Interest in Health and Safety of Women Who Seek Abortions ................ 21

STATE DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................................................... 22

ARGUMENT ....................................................................................................... 40

   I.   Standard of Review .................................................................................. 40

   II.  HB 136 is Reasonably Related to the State's Recognized Legitimate Interests ............ 45

   III.   H.B. 136 Does Not Pose an Undue Burden on a Woman's Right to Choose ........... 52

   IV.  Plaintiff Lacks Article III and Third-Party Standing. .................................................. 54

CONCLUSION .................................................................................................... 55

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adler v. Wal-Mart Stores, Inc.*,
144 F.3d 664 (10th Cir. 1998) ................................................. 46

*Brown v. Plata*,
563 U.S. 493 (2011) ................................................................. 8

*Doe v. Bolton*,
410 U.S. 179 (1973) ................................................................. 60

*Dred Scott v. Sandford*,
60 U.S. 393 (1857) ................................................................. 61

*Elk Grove Unified School District v. Newdow*,
542 U.S. 1 (2004) ................................................................... 61

*EMW Women's Surgical Center, P.S.C., et al, v. Friedlander*,
--- F.3d ---, 2020 WL 6111008 (6th Cir., Oct. 16, 2020) ........... 49

*Estelle v. Gamble*,
429 U.S. 97 (1976) ................................................................. 8

*Gonzales v. Carhart*,
550 U.S. 124 (2007) ......................................................... passim

*Gregg v. Georgia*,
428 U.S. 153 (1976) ........................................................... 8, 48

*Grutter v. Bollinger*,
288 F.3d 732 (6th Cir. 2002) ............................................. 48, 49

*Hopkins v. Jegley*,
968 F.3d 912 (8th Cir. 2020) ................................................ 49

*Jane L. v. Bangerter*,
102 F.3d 1112 (10th Cir. 1996) ......................................... 10, 58

*June Medical Services, LLC v. Russo*,
140 S. Ct. 2103 (2020) ..................................................... passim

*King v. Palmer*,
950 F.2d 771 (D.C. Cir. 1991) (en banc) ............................... 48

*Marks v. United States,*
    430 U.S. 188 (1977) ................................................................. 48

*Memoirs v. Massachusetts,*
    383 U.S. 413 (1966) ................................................................. 49

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
    505 U.S. 833 (1992) ........................................................... passim

*Roe v. Wade,*
    410 U.S. 113 (1973) ........................................................... passim

*Roper v. Simmons,*
    543 U.S. 551 (2005) ................................................................... 8

*Triplett Grille, Inc. v. City of Akron,*
    40 F.3d 129 (6th Cir. 1994) ...................................................... 48

*U.S. v. Kratt,*
    579 F.3d 558 (6th Cir. 2009) .................................................... 48

*Whole Woman's Health v. Paxton,*
    --- F.3d ---, 2020 WL 6218657 (5th Cir., Oct. 13, 2020) ......... 50, 53

*Whole Woman's Health v. Paxton,*
    -- F.3d --, 2020 WL 6495383 (5th Cir. Oct. 30, 2020) ............ 50, 53

*Whole Woman's Health,*
    136 S. Ct. 2292 (2016) .......................................................... 47, 49

*Wilkerson v. Utah,*
    99 U.S. 130 (1879) ..................................................................... 7

**Statutes**

H.B. 136 ..................................................................................... passim

U.S. Const., Art. III ............................................................................ 60

UTAH CODE § 76-7-302.5 ................................................................. 13

UTAH CODE § 76-7-302 .................................................................... 14

UTAH CODE § 76-7-301(5) ............................................................... 13

UTAH CODE § 76-7-314(3) ............................................................... 13

UTAH CODE § 76-7-302(3)(b)(i)(A) ................................................. 13

UTAH CODE § 76-7-302(3)(b)(i)(B) ........................................................ 13

UTAH CODE § 76-7-302(3)(b)(ii)(A) ....................................................... 13

UTAH CODE § 76-7-302(3)(b)(ii)(B) ....................................................... 13

UTAH CODE § 76-7-302(3)(b)(iii)(A)(I) & (II) ....................................... 13

UTAH CODE § 76-7-302(3)(b)(iii)(A)(III) ............................................... 13

UTAH CODE § 76-7-302(3)(b)(iii) ........................................................... 46

**Rules**

DUCivR 7-1(b)(1)(A) .............................................................................. 7

Fed. R. Civ. P. 56(a) ............................................................................... 46

**Other Authorities**

*Brown v. Plata: The Struggle to Harmonize Human Dignity with the Constitution*,
  33 Pace L. Rev. 1255 (2013) ............................................................. 8, 9

*Human Dignity in Supreme Court Constitutional Jurisprudence*,
  84 Neb. L. Rev. 740 (2006) ................................................................. 8

*Human Dignity in the Roberts Court*,
  37 Ohio N.U. L. Rev. 381 (2011) ........................................................ 8

John Hart Ely, *The Wages of Crying Wolf*,
  82 Yale L.J. 920 (1973) ...................................................................... 58

O. Carter Snead, *What it Means to Be Human: The Case for the Body in Public Bioethics*,
270 (2020)………………………………………………………………………………….56

Defendants Gary Herbert, Sean Reyes, Richard Saunders, and Mark Steinagel (collectively, "State Defendants" or the "State") submit this Memorandum in Opposition to Plaintiff's Motion for Summary Judgment.  The State is filing simultaneously with this memorandum a Cross-Motion for Summary Judgment pursuant to Rule 56.  The arguments set forth herein are incorporated into the State's Cross Motion pursuant to DUCivR 7-1(b)(1)(A). The Court should deny Plaintiff's Motion for Summary Judgment and grant the State's Cross-Motion for Summary Judgment for reasons set forth herein.

## INTRODUCTION

In 1879 the United States Supreme Court explored the meaning of the Cruel and Unusual Punishment Clause in a case arising from the Utah Territory.[1] The Court, in the course of deciding whether a particular method of execution violated the Eighth Amendment, said, "it is safe to affirm that punishments of torture, such as [embowellment, beheading, quartering, and burning alive] are forbidden by that emendment to the Constitution."[2] The Court's decision recognized that in addition to liberty, equality, and due process, the Constitution also enshrines human dignity as a constitutional value.[3]

---

[1] *Wilkerson v. Utah*, 99 U.S. 130 (1879).

[2] *Id*. at 135-36.

[3] *See also Brown v. Plata*, 563 U.S. 493, 510 (2011) ("As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons"); *Roper v. Simmons*, 543 U.S. 551, 578 (2005) ("The [Constitution] sets forth, and rests upon, innovative principles original to the American experience, such as federalism; . . . separation of powers; specific guarantees for the accused in criminal cases; and broad provisions to secure individual freedom and human dignity"); *Gregg v. Georgia*, 428 U.S. 153, 182 (1976)("the basic concept of human dignity [is] at the core of the [Eighth] Amendment"); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)("The Amendment embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . .") (internal quotation and citation omitted). For scholarly treatment of human dignity as a constitutional value, *see* Maxine D. Goodman, *Human Dignity in Supreme Court Constitutional Jurisprudence*, 84 Neb. L. Rev. 740 (2006), Erin Daly, *Human Dignity in the Roberts Court*, 37

The sole method of abortion Plaintiff uses after eighteen weeks gestation is markedly similar to drawing and quartering.[4] It entails pulling the limbs off a living human being one by one, and then crushing her skull.[5]  Plaintiff does not give anesthesia directly to the unborn baby.[6] Plaintiff would have this Court believe that the very same Constitution which rightly prevents a state from executing convicted criminals through drawing and quartering also prevents a state from adopting reasonable measures, like the law at issue in this case, that serve to prevent a private doctor from quartering a living human being after 18 weeks gestation – a living human being who is capable of experiencing pain – even as the law allows a woman a meaningful opportunity to choose to have an abortion earlier in pregnancy when other methods of abortion are generally used, and when the unborn human is less likely to experience pain.

However, ours is not a Constitution of contradictions. This Court has a duty to interpret the Constitution in a way that harmonizes its various provisions.[7] The "truest exposition" of the Constitution, according to Joseph Story, is that "which best harmonizes [the Constitution's] design, its object, and its general structure."[8] When the judiciary tells state legislatures that they must accord constitutional dignity to criminal suspects and convicts, but that they are not allowed to recognize the human dignity of an unborn baby, it conveys an inconsistent message.

---

Ohio N.U. L. Rev. 381 (2011), and Benjamin F. Krolikowski, *Brown v. Plata: The Struggle to Harmonize Human Dignity with the Constitution*, 33 Pace L. Rev. 1255 (2013). These articles demonstrate that the Supreme Court has turned to concepts of human dignity to interpret not just the Eighth Amendment, but the First, Fourth, Fifth, Sixth, Seventh and Fourteenth Amendments as well.

[4] *See* Deposition of Dr. David Turok ("Turok Dep."), p. 48, lines 17-20 (State Defs.' App. 0049). The Turok Dep., excluding pages marked confidential, is included in State Defs.' Appendix of Evidence ("State Defs.' App."), pp. 0001-0070.

[5] *See id.*, p. 43, line 15 through p. 46, line 9 (State Defs.' App. 0044-0047).

[6] *See id.*, p. 47, lines 7-11 (State Defs.' App. 0048).

[7] *See* Joseph Story, Commentaries on the Constitution of the United States § 455 (Charles C. Little & James Brown, 2d ed. 1851).

[8] *Id.*

2

The law at issue in this case – H.B. 136 – recognizes the dignity of an unborn human being, while simultaneously preserving a meaningful opportunity to choose an abortion for a woman who wants one.[9] The law is consistent with controlling Supreme Court precedent that has: (1) "blur[red] the line" between previability and post-viability as the point of pregnancy before which states may not regulate abortion procedures which they deem cruel and inhumane;[10] and (2) specifically recognized that state legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty"[11] – such as fetal pain.  H.B. 136 is not only constitutional, but it actively promotes the constitutional goal of affirming the dignity of all human beings.

Roe v. Wade recognized (1) a constitutional right to abortion, and (2) that states "have an important and legitimate interest . . . in protecting the potentiality of human life."[12]  When asked to re-evaluate Roe in 1992, the Supreme Court in Planned Parenthood of Southeastern Pennsylvania v. Casey,[13] affirmed the constitutional right to an abortion, but rejected Roe's rigid trimester framework for evaluating state regulations of abortion. Specifically, the Casey Court found that Roe and its progeny's treatment of all pre-viability government regulations as unwarranted was "incompatible with the recognition that there is a substantial state interest in

---

[9] H.B. 136 prohibits elective abortions after 18 weeks gestation.  Plaintiff's abortion doctor testified that most women who get pregnant know they are pregnant by twelve weeks gestation. He also testified that most abortions are performed in the first twelve weeks of gestation.  See Turok Dep., State Defs.' App., p. 58, line 19 through p. 59, line 1. H.B. 136 measures gestational development from the first day of the woman's last menstrual period ("LMP"). Throughout this memorandum, the State's reference to gestational age uses LMP as the measuring method, unless otherwise noted.

[10] Gonzales v. Carhart, 550 U.S. 124, 171 (2007) (J. Ginsburg, dissenting).

[11] Id. at 163; see also June Medical Services, LLC v. Russo, 140 S. Ct. 2103, 2136 (2020) (C.J. Roberts, concurring in judgment).

[12] Roe v. Wade, 410 U.S. 113, 162 (1973).

[13] Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992).

potential life *throughout* pregnancy."[14] Accordingly, a three-Justice plurality in *Casey* modified *Roe* by replacing its trimester framework with a new test: pre-viability regulations of abortion are permissible unless the state does not have legitimate interests related to the regulation or the regulations create an "undue burden" on a woman seeking an abortion.[15] An undue burden is one that places "a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."[16] The *Casey* Court further observed that pre-viability bans of abortion are *per se* substantial obstacles.[17]

Following *Casey*'s lead, the Tenth Circuit held in 1996 that Utah's 1991 prohibition on abortion after 20 weeks gestational age (as measured from conception) contradicted *Casey* and was therefore unconstitutional.[18] The State concedes that if there had been no further legal or scientific developments in the field of abortion since 1996, then H.B. 136 would fall under the weight of controlling precedent. However, there *have been* substantial legal and scientific developments since 1996. First, the Supreme Court's decision in *Gonzales v. Carhart* "blurs the line" between previability and post-viability as the milestone beyond which states may not pass bans of cruel and inhumane procedures.[19] It also requires courts to accord states "wide discretion" in regulating abortion, particularly when states' regulations address issues of scientific uncertainty.[20] Plaintiff did not cite, let alone discuss, *Gonzales* in its Motion for Summary Judgment.

---

[14] *Id.* at 876 (emphasis added).
[15] *Id.* at 876-77.
[16] *Id.* at 877, 878.
[17] *Id.* at 860.
[18] *See Jane L. v. Bangerter*, 102 F.3d 1112 (10th Cir. 1996).
[19] *Gonzales*, 550 U.S. at 171 (J. Ginsburg, dissenting).
[20] *Id.* at 163.

Second, the scientific community knows much more about fetal development today than it did in 1992 or 1996. Specifically, recent scientific studies demonstrate that the neurological capacity to experience pain develops by at least 18 weeks gestation.[21] For this reason, fetal surgeons have adopted the practice in the last 20 years of administering anesthesia to a fetus prior to performing fetal surgery, including fetuses who have not yet reached 18 weeks as well as those beyond 18 weeks.[22] Protecting a human being in utero from the pain experienced when limbs are removed one at a time supports the State's recognized interest in protecting the life of the unborn child.[23] There have been similar scientific studies in the fields of maternal health and bioethics that further support the State's recognized interests in regulating abortion.

There is *nothing* in the abortion jurisprudence of either the Supreme Court or the Tenth Circuit that prevents a state legislature, or a district court for that matter, from following the science of fetal development exactly to where it leads. Indeed, precedent is clear that the evolving science of fetal development can and should affect abortion jurisprudence because courts must allow legislatures to exercise "wide discretion" when regulating areas involving medical and scientific uncertainty.[24] The State contends that the science of fetal pain sufficiently demonstrates the capacity of a fetus to experience pain when being quartered alive. However, even if the science is in doubt, then under controlling Supreme Court precedent, courts should

---

[21] *See* Expert Report of Dr. Maureen Condic ("Condic Expert Rep."), ¶ 7 (State Defs.' App. 0073). The Condic Expert Rep. is included in State Defs.' App., pp. 0071-0091.
[22] *Id*. at ¶ 45 (State Defs.' App. 0089).
[23] *See Casey*, 505 U.S. at 871 (the State has an interest "in the protection of potential life"); *see also Roe*, 410 U.S. at 162 (the State has an "important and legitimate interest in protecting the potentiality of human life").
[24] *Gonzales* 550 U.S. at 163; *see also June Medical*, 140 S. Ct. at 2136 (C.J. Roberts, concurring in judgment).

grant state legislatures "wide discretion" when addressing uncertainty.[25] The Court should certainly allow the State to err on the side of human dignity.

Here, the State has adopted a reasonable measure – H.B. 136 – that protects the fetus from experiencing pain and further advances other state interests recognized by the Supreme Court. It does so while preserving a meaningful opportunity for a woman to choose an abortion before 18 weeks gestation. Because women still have a meaningful opportunity to obtain an abortion prior to 18 weeks gestation, H.B. 136 is not an "undue burden" or "substantial obstacle" to abortion access. To rule H.B. 136 unconstitutional would be to hold that the State is powerless to protect human beings from excruciating pain merely because that human life has not yet reached an arbitrary point of pregnancy. Further, such a decision would undermine an established constitutional value – that human beings are endowed with human dignity. The State seeks to advance these worthy, constitutionally recognized values. The Court should not block the State from promoting human dignity.

## BACKGROUND

In the 2019 general legislative session, the Utah Legislature passed, and Defendant Governor Gary Herbert signed, H.B. 136. H.B. 136 states, "Notwithstanding any other provision of this part, a person may not perform or attempt to perform an abortion after the unborn child reaches 18 weeks gestational age unless the abortion is permissible for a reason described in Subsection 76-7-302(3)(b)."[26] Utah law defines gestational age as "the age of the unborn child as calculated from the first day of the last menstrual period of the pregnant woman."[27] Violation of

---

[25] *Id*.
[26] H.B. 136 is codified at UTAH CODE § 76-7-302.5.
[27] UTAH CODE § 76-7-301(5).

the law is a second degree felony.[28] Utah law allows post-18 week abortions if: (1) the abortion is necessary to avert the death of the woman on whom the abortion is performed;[29] (2) the abortion is necessary to avert a serious risk of substantial and irreversible impairment of a major bodily function of the woman on whom the abortion is performed;[30] (3) the fetus has a defect that is uniformly diagnosable and uniformly lethal;[31] (4) the fetus has a severe brain abnormality that is uniformly diagnosable;[32] (5) the pregnancy is the result of rape;[33] or (6) the pregnancy is the result of incest.[34]

Plaintiff filed a Complaint on April 10, 2019.[35] Plaintiff and the State stipulated to a preliminary injunction on April 18, 2019.[36] The State filed an Answer on May 2, 2019,[37] and the Court then granted, in part, the State's Motion for Discovery.[38] The parties concluded discovery on September 30, 2020. Plaintiff alleges H.B. 136 violates the Fourteenth Amendment[39] and the State denies the allegation.[40] Both Plaintiff and the State request judgment from this Court as a matter of law.

---

[28] UTAH CODE § 76-7-314(3).
[29] UTAH CODE § 76-7-302(3)(b)(i)(A).
[30] UTAH CODE § 76-7-302(3)(b)(i)(B).
[31] UTAH CODE § 76-7-302(3)(b)(ii)(A).
[32] UTAH CODE § 76-7-302(3)(b)(ii)(B).
[33] UTAH CODE § 76-7-302(3)(b)(iii)(A)(I) & (II).
[34] UTAH CODE § 76-7-302(3)(b)(iii)(A)(III).
[35] See Pl. Compl., ECF No. 2.
[36] See Joint Motion for Preliminary Injunction as to State Defendants, ECF No. 31.
[37] See State Defs.' Answer, ECF No. 35.
[38] See State Defs.' Mot. for Disc., ECF No. 36 and Order Granting in Part and Denying in Part State Defs.' Mot. for Disc., ECF No. 49.
[39] See Pl. Comp., ECF No. 2, ¶ 36.
[40] See State Defs.' Answer, ECF No. 35, ¶ 36.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### Background

1. A fetus is a human being.[41]

2. Most pregnant women know they are pregnant by 12 weeks gestation.[42]

3. Most abortions in Utah and the United States occur before 12 weeks gestation.[43]

4. Utah statistics from 2017 indicate that 91% of abortions occur before 12 weeks gestation.[44]

### The Dilation and Evacuation Method of Abortion

5. Plaintiff is the only abortion provider in Utah that provides elective abortions after 18 weeks LMP.[45]

6. The sole method of abortion used by Plaintiff after 18 weeks gestation is Dilation and Evacuation ("D&E").[46]

7. There are two parts to the D&E procedure.[47]

---

[41] Expert Report of Dr. Farr Curlin ("Curlin Expert Rep."), ¶ 23. The Curlin Expert Rep. is included in State Defs.' App., pp. 0092-0113.

[42] *See* Turok Dep., State Defs.' App., p. 58, line 19 through p. 59, line 1 (State Defs.' App. 0059-0060).

[43] *Id*. The Supreme Court in *Gonzales* determined that 85-90% of abortions are performed in the first three months of pregnancy. *Gonzales*, 550 U.S. at 134.

[44] *See* Utah Vital Statistics, Abortions, 2017, Table R15, included in State Defs.' App., pp. 0114-0157.

[45] *See* Pl. Mot. for Summ. J., ECF No. 78, ¶ 6; *see also* Turok Dep., p. 19, lines 15-20 (State Defs.' App. 0020) ("Q: Is it your understanding that Metro Health Center is the only clinic in the state providing abortions after 18 weeks LMP? A. It is the only non-hospital location I'm aware of. "). "Elective abortion" is not defined by statute. The State uses the phrase herein to describe abortions provided for reasons other than those listed in UTAH CODE § 76-7-302.

[46] *See* Turok Dep., State Defs.' App., p. 48, lines 17-20 (State Defs.' App. 0049) ("Q: So am I correct to understand, then, that for abortions performed at Metro post 18 weeks, the only method used is D&E, right? A. That is correct.").

[47] *See id*., p. 42, lines 17-18 (State Defs.' App. 0043).

8.   The first part entails assuring adequate cervical dilation through the placement of osmotic dilators in the cervix and, for procedures performed past 19 weeks gestation, administering a dose of mifepristone which helps soften the cervix.[48]

9.   After the cervix is adequately dilated, Plaintiff performs the second part of the procedure, usually a day or more later.[49]

10. For the second part of the procedure, Plaintiff sedates the pregnant patient and removes the osmotic dilators.[50]

11. Plaintiff then removes the amniotic fluid with an aspiration machine.[51]

12. Plaintiff then uses forceps to grasp the legs of the  baby, one by one, and pull them off.[52]

13. Plaintiff starts with the legs because they are "the smallest diameter parts [that] are able to come through with the least resistance."[53]

14. Once Plaintiff has pulled off the baby's legs and removed them from the uterus, Plaintiff places them in a small basin.[54]

15. Plaintiff then uses forceps to remove the abdomen, thorax, and arms.[55]

16. The head of the fetus cannot be removed intact because "the cervical dilation does not permit it."[56]

---

[48] *See id*., p. 42, line 29 though p. 43, line 4 (State Defs.' App. 0043-0044).
[49] *See id*., p. 43, lines 5-10 (State Defs.' App. 0044).
[50] *See id*., p. 43, lines 15-20 (State Defs.' App. 0044).
[51] *See id*., p. 44, lines 6-8 (State Defs.' App. 0045).
[52] *See id*. p. 44, line 15 through p. 45, line 9 (State Defs.' App. 0045-0046).
[53] *See id*. p. 45, lines 17-22 (State Defs.' App. 0046).
[54] *See id*. p. 45, lines 13-16 (State Defs.' App. 0046).
[55] *See id*. p. 45, lines 23-25 (State Defs.' App. 0046).
[56] *See id*. p. 45, lines 13-16 (State Defs.' App. 0046).

17. Plaintiff, therefore, crushes the head of the fetus before removing it.[57]

18. During the procedure, Plaintiff uses the forceps to separate the fetus into up to ten separate pieces.[58]

19. Plaintiff does not administer anesthesia directly to the fetus before or during the procedure.[59]

20. Plaintiff does not ensure fetal demise (death) prior to performing the procedure and does not know when fetal demise takes place during the procedure.[60]

21. It is common for Plaintiff's abortion doctor to never see the patient again after the abortion.[61]

22. Dr. Anthony Levatino is a board-certified obstetrician gynecologist.[62]

23. Dr. Levatino has performed approximately 1,200 abortions, over 100 of which were second trimester D&E procedures.[63]

24. In videos found at the website www.abortionprocedures.com, Dr. Levatino demonstrates how D&E procedures are performed, which videos are true, accurate, and authentic descriptions of the procedure.[64]

---

[57] *See id*. p. 46, lines 1-9 (State Defs.' App. 0047).
[58] *See id*. p. 47, lines 15-24 (State Defs.' App. 0048).
[59] *See id*. p. 47, lines 7-11 (State Defs.' App. 0048).
[60] *See id*. p. 46, lines 10-14 and p. 47, lines 12-14(State Defs.' App. 0047).
[61] *See id*., p. 50, lines 22-24 (State Defs.' App. 0051).
[62] *See* Declaration of Anthony Levatino ("Levatino Dec."), ¶ 2. The Levatino Dec. is included in State Defs.' App., pp. 0158-0159.
[63] *See* Levatino Dec., ¶ 5 (State Defs.' App. 0159).
[64] *See id*., ¶¶ 7-8 (State Defs.' App. 0159).

### *State's Interest in Protecting the Life of the Unborn*

25. The Supreme Court has recognized the State's interest in protecting the life of an unborn baby.[65]

26. For purposes of pain perception, the human nervous system can be divided into three general areas: (1) the cortex; (2) subcortical regions; and (3) the spinal cord.[66]

27. The spinal cord contains neurons that receive sensory information from the body (including pain information) and relay this information to structures in subcortical regions of the brain.[67]

28. In the spinal cord, pain information is used to activate motor neurons that cause withdrawal of the body from a painful stimulus.[68]

29. The earliest rudiment of the human nervous system forms by 28 days of gestational development (six weeks post LMP). At this stage, the primitive brain is already "patterned;" that is, cells in different regions are specified to produce structures appropriate to their location and function in the nervous system as a whole.[69]

30. The brain grows enormously over the next several weeks, as shown in Figure 1, such that by 50 days (nine weeks post LMP), the rudiments of the major regions of the central nervous system have all been established.[70]

---

[65] *See Casey*, 505 U.S. at 871 (the State has an interest "in the protection of potential life"); *see also Roe*, 410 U.S. at 162 (the State has an "important and legitimate interest in protecting the potentiality of human life").

[66] *See* Condic Expert Rep., ¶ 14 (State Defs.' App. 0075).

[67] *See id.*

[68] *See id.*, ¶ 15(State Defs.' App. 0075) .

[69] *See id.*, ¶ 16 (State Defs.' App. 0076).

[70] *See id.*

11



Figure 1: Human brain development. Ages indicate time since sperm-egg fusion. For gestational age based on date of the last menstrual period (LMP), add 14 days.[71]

31. The neural circuitry responsible for the spinal reflex, the most primitive response to pain, is in place by eight weeks of development (10 weeks post LMP). This is the earliest point at which the fetus is capable of detecting and reacting to painful stimuli in any capacity.[72]

32. The earliest connections between neurons in the subcortical-frontal pathways are detected by 37 days and are well established by 8-10 weeks.[73]

33. Thus, the neural circuitry required to detect and respond to pain is in place by 8-10 weeks of human development.[74]

34. Connections between the spinal cord and subcortical nuclei in the thalamus begin to form around 14 weeks post LMP and are completed by 20 weeks post LMP.

35. Further, there is an enormous body of scientific data that clearly indicates the cortex is not required for either consciousness or suffering.[75]

---

[71] *See id.*
[72] *See id.*, ¶ 18 (State Defs.' App. 0076-0077).
[73] *See id.*, ¶ 20 (State Defs.' App. 0077-0078).
[74] *See id.*, ¶ 23 (State Defs.' App. 0079).
[75] *See id.*, ¶ 30 (State Defs.' App. 0082) .

36. Extensive studies have determined that the neural structures underlying the most primitive form of consciousness in both humans and animals are found in subcortical regions of the brain.[76]

37. One expert has categorically stated that "it is now eminently clear that affective consciousness is a property of subcortical circuits we share with the other animals."[77]

38. These "subcortical circuits" include brain structures that are well developed in a human fetus by 18 weeks.[78]

39. Mammals (including rodents, cats, and primates) that have had the cortex partially or fully removed remain conscious and continue to show a vigorous response to painful stimuli.[79]

40. Similarly, human children born without a full cortex are capable of conscious behaviors, including smiling, distinguishing between familiar/unfamiliar people and situations, having preferences for particular kinds of music, and having adverse reactions to pain. This evidence indicates that long-range cortical connections developing only after 22 weeks in the human fetus are not obligatory for consciousness or for a psychological perception of suffering.[80]

41. The largest study conducted to date of human patients with disorders of consciousness unambiguously concludes that loss of *subcortical*, not *cortical* circuitry is associated with loss of consciousness.[81]

---

[76] *See id*., ¶ 31 (State Defs.' App. 0082) .
[77] *See id.* (quoting Panksepp, J., *Cross-Species Affective Neuroscience Decoding of the Primal Affective Experiences in Humans and Related Animals*, *PLoS ONE*, *6*(9). doi: 10.1371/journal.pone.0021236 (2011)).
[78] *See id.*
[79] *See id*., ¶ 32 (State Defs.' App. 0083).
[80] *See id*., ¶ 33 (State Defs.' App. 0083).
[81] *See id*., ¶ 34 (State Defs.' App. 0083-0084).

42. Moreover, experts in the study of consciousness conclude that consciousness clearly persists in the absence of vast regions of the cortex.[82]

43. Recent authoritative reviews of the neural basis of consciousness and emotion in humans conclude that the available evidence indicates that later developing sectors of the nervous system, such as the cerebral cortex, contribute to but are not essential for the emergence of feelings, which are likely to arise instead from older regions such as the brainstem and that the neural substrates of consciousness can be found at all levels of the nervous system.[83]

44. Recent work using high resolution brain imaging in both animals and humans strongly indicates that anesthesia-induced loss of consciousness is associated with a reduction in the activity of the *thalamus* (subcortical), that is only later followed by a suppression of cortical activity in response to reduced thalamic function.  These studies indicate that consciousness, and therefore conscious pain perception, depend on *subcortical* not *cortical* activity.[84]

45. The cortical regions associated with processing of painful experiences continue to develop for decades after birth, with these regions being among the last to achieve maturity.  However, our perception of physical pain and suffering remains relatively constant from childhood into adulthood, strongly indicating that while our *understanding* of pain and the *associations* it elicits may become more complex over time, late-developing cortical circuitry is not required for a conscious experience of suffering.[85]

46. While the cortex may process painful experiences delivered to the cortex from other brain regions, it is largely not involved in producing a conscious experience of pain. A

---

[82] *See id.*
[83] *See id.*, ¶ 35 (State Defs.' App. 0084) .
[84] *See id.*, ¶ 36 (State Defs.' App. 0084).
[85] *See id.*, ¶ 37 (State Defs.' App. 0085).

human's conscious experience of suffering depends almost entirely on subcortical brain regions that develop very early in the human fetus.[86]

47. Ablation or stimulation of the *cortex* does not affect pain perception, whereas altering the function of *subcortical* structures, including the thalamus, does.[87]

48. The extensive and diverse body of data clearly indicates that detection of pain, including conscious pain perception or suffering does not depend on cortical circuitry and is largely mediated by *subcortical* brain networks. It is universally accepted that subcortical circuits capable of pain perception are established in a human fetus between 14-20 weeks LMP.[88]

49. A recent review of the evidence concludes that from the 15th week LMP onward, "the fetus is extremely sensitive to painful stimuli, [a] fact that should be taken into account when performing invasive medical procedures on the fetus. It is necessary to apply adequate analgesia to prevent the suffering of the fetus."[89]

50. Moreover, the current scientific literature indicates that endogenous neural inhibitors present in utero do not provide adequate anesthetic effect, making direct fetal analgesia/anesthesia in surgery mandatory.[90]

51. In support of the conclusion that pain is experienced very early in human development, fetuses delivered prematurely (as early as 23 weeks), show clear pain-related

---

[86] *See id.*, ¶ 38 (State Defs.' App. 0085-86).
[87] *See id.*, ¶ 39 (State Defs.' App. 0086).
[88] *See id.*, ¶ 40 (State Defs.' App. 0087).
[89] *See id.*, ¶ 42 (State Defs.' App. 0087-0088) (quoting Sekulic, S., Gebauer-Bukurov, K., Cvijanovic, M., Kopitovic, A., Ilic, D., Petrovic, D., Topalidou, A., "*Appearance of fetal pain could be associated with maturation of the mesodiencephalic structures,*" Journal of Pain Research 9, 1031-1038 (2016)).
[90] *See id.*

behaviors. Strikingly, the earlier infants are delivered, the stronger their response to pain, perhaps due to the absence of late developing cortical circuits that *inhibit* pain perception.[91]

52. These and many other direct observations of fetal behavior and physiology have resulted in a clear consensus among professional anesthesiologists that the use of medications to relieve pain is warranted in cases of fetal surgery. Many of the advocates of fetal anesthesia make no claims regarding the *qualitative* nature of fetal pain (that is, whether the fetus subjectively "suffers"), but based on both the scientific literature and on their own observations, they clearly conclude that pain *exists* for these fetuses and that they are obligated to address fetal pain medically, despite the many serious challenges and medical risks entailed in providing pain relief to a fetus in utero.[92]

53. Plaintiff's abortion doctor does not think the administration of anesthesia for fetal surgery prior to 24 weeks gestational age is necessary.[93]

54. Plaintiff's abortion doctor does not know whether a fetus could experience pain at any point prior to birth.[94]

---

[91] *See id.*, ¶ 43 (State Defs.' App. 0088) .
[92] *See id.*, ¶ 45 (State Defs.' App. 0089) .
[93] *See* Turok Dep., State Defs.' App., p. 57, lines 3-10 (State Defs.' App. 0058).
[94] *See id.*, p. 57, line 24 through p. 58, line 18 (State Defs.' App. 0058-0059).

### *State's Interest in the Ethics of its Medical Profession*

55. The Supreme court has recognized the State's interest in protecting the integrity of the ethics of the medical profession.[95]

56. Plaintiff's abortion doctor does not believe the administration of anesthesia prior to 24 weeks gestational age is necessary.[96]

57. Plaintiff's abortion doctor does not know whether a fetus could experience pain at any point prior to birth.[97]

58. Plaintiff's abortion doctor does not draw a "hard and fast line" in gestational development beyond which he would perform an abortion.[98]

59. Plaintiff's abortion doctor does not have a moral objection to an abortion being performed at nine months of pregnancy but would not perform the procedure himself "due to gestational size."[99]

60. Plaintiff's abortion doctor would perform an abortion even if the abortion were sought because the unborn baby was handicapped.[100]

61. Plaintiff's abortion doctor would perform an abortion even if the abortion were sought because the unborn baby was a girl.[101]

---

[95] *Gonzales*, 550 U.S. at 157 ("There can be no doubt the government has an interest in protecting the integrity and ethics of the medical profession")(internal quotation and citation omitted).

[96] *See* Turok Dep., State Defs.' App., p. 57, lines 3-10 (State Defs.' App. 0058).

[97] *See id.*, p. 57, line 24 though p. 58, line 18 (State Defs.' App. 0058-0059).

[98] *See id.*, p. 34, line 20 though p. 35, line 1 (State Defs.' App. 0035).

[99] *See id.*, p. 34, lines 6-20 (State Defs.' App. 0035).

[100] *See id.*, p. 32, lines 3-11 (State Defs.' App. 0033) .

[101] *See id.*, p. 32, lines 12-21 (State Defs.' App. 0033) .

62. Plaintiff's abortion doctor would perform an abortion even if the abortion were sought because the unborn baby was a particular race.[102]

63. For more than two millennia, there was medical consensus that the commitment to do no harm, often now referred to as the principle of nonmaleficence, includes refusing to cause an abortion. From the Hippocratic reform movement in ancient Greece until shifts in some quarters starting in the 1960s, medical oath and codes consistently condemned elective abortion as contradicting physician's constitutive profession commitment to never intentionally damage or destroy the health of another.[103]

64. Currently, several prominent medical professional organizations either have a policy of neutrality toward abortion or claim, as the American College of Obstetricians and Gynecologists does, that abortion is an essential part of healthcare. Such policies, however, mask persistent opposition to abortion among a large proportion of U.S. physicians, including members of these professional organizations. Indeed, a large representative study of U.S. obstetrician gynecologists found that only one in seven (14%) ever performs abortions, while 41% morally object to elective abortion in a typical case (failed contraception), even at just six weeks gestation.[104]

65. There is abundant evidence of societal consensus that it is reasonable and ethical to show moral regard for the fetus. The federal Partial-Birth Abortion Ban Act of 2003 prohibits intact dilation and evacuation ("partial birth abortion") from being performed at any gestational age. The federal Born Alive Infants Protection Act requires that if an infant intended to die via abortion is born with signs of life and is viable, that infant must be given the same protections

---

[102] *See id.*, p. 32, lines 19-25 (State Defs.' App. 0033) .
[103] *See* Curlin Expert Rep., State Defs.' App., ¶ 13 (State Defs.' App. 0095) .
[104] *See id.*, ¶ 15 (State Defs.' App. 0096).

any other person is entitled to under the law. Utah law prohibits medical experimentation on fetuses, even those intended for abortion. And the Supreme Court has affirmed that the states have constitutional authority to regulate the treatment of fetuses in this way.[105]

66. The characteristic practices of physicians also show moral regard for the fetus. Even those physicians who support elective abortion do not disregard the fetus in other contexts. For instance, physicians caring for women routinely take great care to not harm the developing fetus. They use careful shields against radiation when taking radiographic images, or even use alternative imaging modalities to avoid radiation altogether. Whenever possible, when caring for pregnant women they choose medication alternatives that are less risky to the health of the fetus. Physicians have even developed methods for performing surgeries on the fetus in utero in order to preserve and restore the fetus's health.[106] And, even before conception, they sometimes refuse to prescribe medicines that are known to cause birth defects unless the patient is willing to commit to using contraceptives.

67. HB 136 is supported by an added ethical concern—namely, by 18 weeks gestation, the sole abortion method used by Plaintiff is D&E in which the fetus is killed by dismembering it using medical instruments.[107]

68. Killing the fetus that way is cruel and inhumane.[108]

69. Even for physicians, dismembering a living fetus is a disturbing procedure.[109]

---

[105] *See id.*, ¶ 29 (State Defs.' App. 0100).
[106] *See id.*, ¶ 30 (State Defs.' App. 0100-0101).
[107] *See id.*, ¶ 43 (State Defs.' App. 0104).
[108] *See id.*, ¶ 44 (State Defs.' App. 0104-0105).
[109] *See id.*

70. Where execution of human beings is lawful, ethical concerns prohibit execution from being carried out through inhumane means.[110]

71. Even research animals must be euthanized in humane ways.[111]

72. HB 136 helps to defend against further ethical disintegration of the medical profession, and further erosion of the public trust, without which physicians cannot effectively do their work.[112]

73. Physicians' commitment not to cooperate in killing has facilitated public trust in the profession.[113]

74. This boundary against killing (whether through abortion or assisted suicide or euthanasia) has guarded doctors against endemic temptations to use their knowledge and skills in unethical ways, and so facilitated the trust needed for vulnerable patients to give themselves over to physicians' care when the patients are in need of treatment.[114]

75. Abortion directly contradicts medicine's orientation to health and so has introduced a conspicuous contradiction into the profession.[115]

76. Unrestricted abortion encourages a new model of medicine in which physicians are *providers of services* where the well-being of the patient is subjectively defined and understood principally in terms of satisfying the patient's wishes.[116]

---

[110] *See id.*
[111] *See id.*
[112] *See id.*, ¶ 54 (State Defs.' App. 0108).
[113] *See id.*, ¶ 56 (State Defs.' App. 0108-0109).
[114] *See id.*
[115] *See id.*, ¶ 57 (State Defs.' App. 0109).
[116] *See id.*

77. This reduction of physicians from healers into technicians—transforming medicine's traditional ethic to a new *provider-of-services* model—has led to moral detachment by clinicians.[117]

### State's Interest in Health and Safety of Women Who Seek Abortions

78. Most women know they are pregnant by 12 weeks.[118]

79. Health risks associated with abortion increase with gestational age.[119]

80. Maternal mortality increases with gestational age at the time of the abortion.[120]

81. The frequency of complications from abortion increases in later gestational ages due to inherently greater technical complexity related to the anatomical and physiologic changes that occur as pregnancy advances.[121]

82. The increased size of the baby and increased amount of placental tissue requires a greater degree of cervical dilation; the increased blood flow to a thin relaxed uterus predisposes to hemorrhage; and elongated myometrium is more subject to mechanical perforation.[122]

83. CDC researchers found that the risk of death for the mother increased by 38% beyond the baseline risk for each additional week beyond 8 weeks.[123]

84. Compared to early abortions, the relative risk of death was 14.7 times higher at 13-15 weeks, 29.5 times higher at 16-20 weeks, and 76.6 times higher beyond 21 weeks.[124]

---

[117] *See id.*
[118] *See* Turok Dep., State Defs.' App., p. 58, line 19 through p. 59, line 1 (State Defs.' App. 0059-0060).
[119] *See* Declaration of David Turok, M.D., in support of Pl.'s Mot. for Prelim. Inj., ECF No. 12-1, ¶26.
[120] *See* Expert Report of Dr. Byron Calhoun ("Calhoun Expert Rep."), p. 4 (a) (State Defs.' App. 0161). The Calhoun Expert Rep. is included in State Defs.' App., pp. 0160-0270.
[121] *See id.*, ¶ 42 (State Defs.' App. 0171).
[122] *See id.*
[123] *See id.*, ¶ 43 (State Defs.' App. 0171-0172).
[124] *See id.*

85. Numerous studies, performed after the Supreme Court's decision in *Casey*, have confirmed that abortions become more life threatening to the mother as the pregnancy advances.[125]

86. Elective abortions are associated with greater psychological health risks to women than pregnancies carried to term.[126]

87. As pregnancy proceeds and the development of the fetus progresses, abortion-related risks to the psychological well-being of the mother increase substantially.[127]

88. A woman's risk of adverse psychological consequences is exacerbated as the fetus develops and abortions occur at later gestational points in pregnancy.[128]

89. Doctors and other abortion clinic personnel may also experience increased stress and traumatic responses for abortions performed later in pregnancy as fetuses develop and their human features become undeniable.[129]

## STATE DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Plaintiff Planned Parenthood Association of Utah ("PPAU") is a nonprofit corporation that provides comprehensive reproductive health care, including previability abortion up to and after 18 weeks LMP.

**RESPONSE:** Undisputed.

2.     While each pregnancy is different, no fetus is viable at 18 weeks, as measured from the first day of the patient's last menstrual period ("LMP").

---

[125] *See id*.
[126] *See* Expert Report of Dr. Priscilla Coleman ("Coleman Expert Rep."), ¶ 7 (State Defs.' App. 0273). The Coleman Expert Report is included in State Defs.' App., pp. 0271-0305.
[127] *See id*.
[128] *See id*., ¶ 9 (State Defs.' App. 0274).
[129] *See id*., ¶ 7 (State Defs.' App. 0273).

**RESPONSE:** Undisputed.

3.     PPAU provides abortion only at its Metro Health Center in Salt Lake City.

**RESPONSE:** Undisputed.

4.     PPAU's Metro Health Center is licensed by the Utah Department of Health as an abortion clinic authorized to perform first- and second-trimester abortions.

**RESPONSE:** Undisputed.

5.     PPAU's Director of Surgical Services provides previability abortion at and after 18 weeks of pregnancy at PPAU. He is a board-certified obstetrician-gynecologist who is licensed to practice medicine in the State of Utah.

**RESPONSE:** Undisputed.

6.     PPAU's Metro Health Center is the only clinic in the entire state providing generally available abortion at and after 18 weeks LMP.

**RESPONSE:** Undisputed.

7.     PPAU provides compassionate, individualized care to patients who seek abortion at its Metro Health Center, many of whom have previously relied on PPAU for other health care needs before coming to PPAU for abortion.

**RESPONSE:** State Defendants lack sufficient information to dispute or not dispute Plaintiff's statement that it provides "compassionate" care to its patients and whether its abortion patients have previously relied on Plaintiff for other health care needs. However, State Defendants assert that the allegations of paragraph 7 of Plaintiff's Statement of Facts are immaterial to resolution of this case because whether or not Plaintiff's care is compassionate, and whether or not its abortion patients have received other services from Plaintiff does not affect the constitutional inquiry into H.B. 136.

23

8.      Half of PPAU's abortion patients already have children.

**RESPONSE:** State Defendants lack sufficient information to dispute or not dispute the allegation in paragraph 8 of Plaintiff's Statement of Facts. However, State Defendants assert that the allegation contained therein is immaterial to resolution of this case because whether or not Plaintiff's abortion patients have other children does not affect the constitutional inquiry into H.B. 136.

9.      The vast majority of PPAU's patients (88% in 2019) report living in poor or low-income households.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 9 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because, unless Plaintiff is making an "as-applied" challenge to H.B. 136, the question of whether the majority of Plaintiff's abortion patients live in poor or low-income households does not affect the constitutional inquiry into H.B. 136.[130]

10.     In 2020, the federal poverty level for a one-person household is $12,760 per year, or $1,063 per month. For a two-person household, the 2020 federal poverty level is $17,240 per year, or $1,436 per month.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 10 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because, unless Plaintiff is

---

[130] In Pl.'s Mot. for Summ. J., ECF No. 78, p. 19, Plaintiff asserts that H.B. 136 is facially unconstitutional.

making an "as-applied" challenge to H.B. 136, the question of where the poverty line falls does not affect the constitutional inquiry into H.B. 136.

11.     A person working full-time, year-round at Utah's prevailing minimum wage of $7.25 per hour would have an annual gross income of $15,080, or $1,256 per month.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 11 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because, unless Plaintiff is making an "as-applied" challenge to H.B. 136, the question of the annual income of someone making minimum wage in Utah does not affect the constitutional inquiry into H.B. 136.

12.     A person who lives in a household with an income below the federal poverty level is considered "poor."

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 12 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because, unless Plaintiff is making an "as-applied" challenge to H.B. 136, the question of whether someone with an income below the poverty line is considered "poor" does not affect the constitutional inquiry into H.B. 136.

13.     A person who lives in a household with an income below 200% of the federal poverty level is considered "low-income."

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 13 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because, unless Plaintiff is making an "as-applied" challenge to H.B. 136, the question of whether someone with an income

below 200% of the federal poverty level is considered "low income" does not affect the

constitutional inquiry into H.B. 136.

14.     Poor and low-income women face higher odds of having an unintended

pregnancy and abortion as compared to more affluent women, who have better access to health

care services and contraception.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 14 of

Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the

allegation contained therein is immaterial to resolution of this case because, unless Plaintiff is

making an "as-applied" challenge to H.B. 136, the question of whether poor and low-income

women face higher odds of unintended pregnancy and abortion than more affluent women does

not affect the constitutional inquiry into H.B. 136.

15.     PPAU's patients decide to have abortions for a variety of reasons, and often for

more than one reason at once.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 15 of

Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the

allegation contained therein is immaterial to resolution of this case because the reasons women

seek to have an abortion is not part of the inquiry into whether an abortion regulation is an

"undue burden."

16.     Some patients decide to have an abortion because they struggle with basic unmet

needs for their existing children.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 16 of

Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reasons women seek to have an abortion is not part of the inquiry into whether H.B. 136 is an "undue burden."

17.     Other patients decide that they are not ready to become parents because of their age or because they want to complete their education before starting a family.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 17 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reasons women seek to have an abortion is not part of the inquiry into whether H.B. 136 is an "undue burden."

18.     Some patients have health complications during pregnancy and seek abortion to preserve their own health.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 18 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reasons women seek to have an abortion is not part of the inquiry into whether H.B. 136 is an "undue burden."

19.     Other patients are referred to PPAU by genetic counselors or other doctors after making the difficult decision to end a wanted pregnancy because of a fetal medical diagnosis.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 19 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reasons women seek to have an abortion is not part of the inquiry into whether H.B. 136 is an "undue burden."

20.     In some cases, patients are struggling with opioid or other drug addiction and decide not to become parents during that struggle.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 20 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reasons women seek to have an abortion is not part of the inquiry into whether H.B. 136 is an "undue burden."

21.     Other patients have abusive partners and fear being connected to that person for life through a shared child.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 21 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reasons women seek to have an abortion is not part of the inquiry into whether H.B. 136 is an "undue burden."

22.     Patients generally try to access abortion as early in their pregnancy as they are able, but in practice numerous barriers can cause delay.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 22 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because "barriers" to abortion access that are not related to governmental action are not part of the inquiry into whether an abortion regulation is an "undue burden."

23.     A patient may not realize that she is pregnant for many weeks or even months, particularly if she has irregular menstrual cycles.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 23 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because "barriers" to abortion access that are not related to governmental action are not part of the inquiry into whether an

abortion regulation is an "undue burden." State Defendants further respond that some women do not realize they are pregnant until after the fetus is viable.[131]

24.     A patient may experience several additional weeks of delay while she confirms the pregnancy, researches her options, decides to seek an abortion, contacts PPAU, and schedules an initial appointment with a PPAU health center.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 24 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because delays to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

25.     Some patients also need time to figure out how to pay for an abortion, as well as for associate costs such as transportation, missed work, and childcare expenses.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 25 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because delays to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

26.     Because the cost of abortion increases with gestational age, these financial hurdles intensify in the second trimester of pregnancy.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 26 of

---

[131] *See* Turok Dep., State Defs.' App., p. 12, line 25 through p. 13, line 3 (State Defs.' App. 0013).

Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

27.     Patients who work in low-wage jobs are likely to lack predictable work schedules, making it especially difficult to save for a medical expense, to schedule clinic appointments, and to arrange transportation and childcare in advance.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 27 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

28.     Some patients may not be able to take multiple days off from work without jeopardizing their jobs.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 28 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

29.     In particular, patients who work in the service industries are unlikely to have access to paid time off work, such that they must take uncompensated time off work to attend medical appointments.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 29 of

Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

30.     Even patients who take unpaid time off work to attend an appointment may have to disclose to their employer why they are missing work, thus compromising the confidentiality of their decision to obtain an abortion.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 30 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

31.     Some patients cannot obtain childcare for multiple days in a row without revealing to family or other caregivers the reason for their need, jeopardizing their confidentiality.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 31 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

32.     Because abortions at or after 16 weeks LMP typically require two separate appointments on consecutive days, most out-of-town patients obtaining abortions at PPAU at or after 16 weeks stay the night in Salt Lake City.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 32 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

33.     Due to this overnight stay, patients seeking abortion at or after 16 weeks LMP face additional challenges negotiating work schedules and childcare and assembling the resources needed to obtain an abortion.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 33 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

34.     For patients living below 200% of the federal poverty level, these financial and logistical barriers are especially problematic.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 34 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

35.     To navigate financial barriers to health care, including abortion, low-income and poor women must forgo essential expenses such as food, utility payments, car payments, or rent.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 35 of

Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

36.     Similarly, poor and low-income women might delay appointments for health care, including abortion, because they need the money to pay for basic needs for themselves and their families.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 36 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

37.     Some patients seek an abortion at or after 18 weeks because they discover a fetal anomaly through prenatal testing that generally cannot occur until 18 to 20 weeks LMP.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 37 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because the reason a pregnant woman seeks an abortion is not part of the inquiry into whether an abortion regulation is an "undue burden."

38.     In some circumstances, the findings from this testing are inconclusive and necessitate referrals to other medical professionals and additional testing.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 38 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the

allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

39.     While this additional consultation helps ensure that patients are able to make the right decisions for themselves and their families based on the most accurate medical information available, it can further delay the point at which a patient decides to end a wanted pregnancy.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 39 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because barriers to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

40.     Other patients seek abortions at or after 18 weeks LMP because they have a medical condition that does not manifest itself, or does not worsen, until that time.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 40 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because delays to abortion access that are not related to governmental action is not part of the inquiry into whether an abortion regulation is an "undue burden."

41.     All of these individual circumstances can lead to further delays.

**RESPONSE:** State Defendants do not dispute the allegation of paragraph 41 of Plaintiff's Statement of Facts for purposes of this motion. State Defendants also contend that the allegation contained therein is immaterial to resolution of this case because delays to abortion access that are not related to governmental action is not part of the inquiry into whether an

abortion regulation is an "undue burden."

42.    Delays in abortion access are compounded by Utah's mandatory delay law, which requires patients to have an initial, medically unnecessary consultation with clinic staff to obtain state-mandated disclosures, and then to wait at least 72 hours before obtaining an abortion.

**RESPONSE:** Disputed.  The Supreme Court has upheld mandatory waiting periods as constitutional – they are not substantial obstacles or undue burdens on a woman's right to choose an abortion.[132] Nor are they at issue in this case. Other delays to abortion access resulting from circumstances other than government action are immaterial to resolution of this case because they are not part of the calculus of whether a governmental regulation is an "undue burden."

43.    HB 136 bans abortion in Utah at and after 18 weeks LMP, subject to certain narrow exceptions.

**RESPONSE:** State Defendants do not dispute that H.B. 136 bans elective abortions in Utah at and after 18 weeks LMP, but disputes Plaintiff's characterization of the circumstances under which a woman may obtain an abortion after 18 weeks LMP as "narrow exceptions."

44.    If HB 136 takes effect, to avoid criminal penalties and the threat of license revocation, PPAU and its physicians and staff will be forced to stop providing nearly all previability abortion to patients at and after 18 weeks LMP.

**RESPONSE:** Undisputed.

45.    If HB 136 takes effect, PPAU will be forced to limit its abortion services to patients with pregnancies past 18 weeks LMP so that it provides abortions only where it can determine that one of the legal exceptions to the 18-week ban applies.

---

[132] *See, e.g., Casey*, 505 U.S. at 886-887.

**RESPONSE:** Undisputed.

46.     If HB 136 takes effect, it will deprive PPAU's patients of the freedom to make a very personal and nuanced decision in consultation with their families and their care providers.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP.  Most women know they are pregnant by 12 weeks LMP.[133]  Indeed, most abortions take place before 12 weeks LMP.[134]

47.     This will harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families.

**RESPONSE:** Disputed.  The State has presented evidence that the physical and psychological risks of abortion increase as pregnancy progresses.[135]  Plaintiff's own abortion doctor declared, "[E]ven at or after 18 weeks of pregnancy, health risks associated with abortion do rise with gestational age."[136]

48.     Without access to PPAU's services, some patients will be forced to travel hundreds of miles across state lines to try to access abortion at or after 18 weeks.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks LMP.[137] Indeed, most abortions take place before 12 weeks LMP.[138]

---

[133] *See* Turok Dep., State Defs.' App., p. 58, line 19 through p. 59, line 1 (State Defs.' App. 0059).
[134] *Id.*
[135] *See* Calhoun Expert Rep., State Defs.' App., p. 4 (a) (State Defs.' App. 0161); *see also* Coleman Expert Rep., State Defs.' App., ¶ 7 (State Defs.' App. 0273).
[136] *See* Declaration of David Turok, M.D., in support of Pl.'s Mot. for Prelim. Inj., ECF No. 12-1, ¶26.
[137] *See* Turok Dep., State Defs.' App., p. 58, line 19 through p. 59, line 1 (State Defs.' App. 0059).
[138] *Id.*

49.     If abortion at and after 18 weeks LMP is no longer available in Utah, the distance

to the nearest provider of abortion at and after 18 weeks LMP for patients in counties along the

Wasatch Front—counties that contain more than 86 percent of Utah's total population—will

increase by more than 300 miles each way.

**RESPONSE:** Undisputed.

50.     Patients in Salt Lake County—which alone contains roughly 36 percent of the

state's population—will experience an estimated additional travel distance of 393 miles each

way to the nearest provider of abortion at and after 18 weeks of pregnancy.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women

to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks

LMP.[139] Indeed, most abortions take place before 12 weeks LMP.[140]

51.     Given the logistical hurdles associated with traveling out-of-state, patients forced

by HB 136 to travel are likely to obtain abortions later than they would have had they accessed

care at PPAU.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women

to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks

LMP.[141] Indeed, most abortions take place before 12 weeks LMP.[142]

52.     In particular, this additional travel distance will delay abortion access for poor

and low-income patients, who will have an especially hard time navigating the additional travel

cost and logistical complexity.

---

[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks LMP.[143] Indeed, most abortions take place before 12 weeks LMP.[144]

53.     Because HB 136 would exacerbate existing financial and logistical barriers to abortion access for poor and low-income patients, those patients would be forced to make even greater trade-offs among other essential needs in order to access abortion in other states.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks LMP.[145] Indeed, most abortions take place before 12 weeks LMP.[146]

54.     By increasing logistical barriers to abortion access, HB 136 will jeopardize poor and low-income patients' employment, as well as the confidentiality of their decision to obtain an abortion.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks LMP.[147] Indeed, most abortions take place before 12 weeks LMP.[148]

55.     For some patients, travel to another state will simply not be possible. As a result, these patients will be forced to carry unwanted pregnancies to term.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks

---

[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*

LMP.[149] Indeed, most abortions take place before 12 weeks LMP.[150]

56.      HB 136 will have a particularly devastating impact on patients whose mental or physical wellbeing is threatened by continuing their pregnancies but whose conditions may not qualify for the health exception to the 18-week ban.

**RESPONSE:** Disputed. H.B. 136 leaves in place a meaningful opportunity for women to choose an abortion before 18 weeks LMP. Most women know they are pregnant by 12 weeks LMP.[151] Indeed, most abortions take place before 12 weeks LMP.[152]

57.      Such conditions may include those that do not manifest, or worsen, until at or after 18 weeks LMP, such as radically worsening diabetes or hypertension; a flare of an autoimmune disorder, such as lupus or Crohn's disease; neurologic conditions, such as severe, intractable migraines or an exacerbation of multiple sclerosis; or bodily trauma.

**RESPONSE:**  State Defendants do not dispute that some conditions may manifest or worsen at and after 18 weeks LMP, including at and after viability.

58.      HB 136 will add to the anguish of patients and their families who receive certain fetal diagnoses later in pregnancy, where those diagnoses do not constitute conditions that are "uniformly diagnosable" and either a "lethal" anomaly or a "severe brain abnormality" and thus do not qualify for the fetal anomaly exception to the 18-week ban.

**RESPONSE:** State Defendants do not dispute that the decision to have an abortion at any point in pregnancy, before or after viability, can cause anguish to patients and their families.

59.      HB 136 will also bar abortion after 18 weeks LMP for survivors of rape and incest

---

[149] *Id.*
[150] *Id.*
[151] *Id.*
[152] *Id.*

who, out of shame or fear, have not involved law enforcement or who do not wish to discuss the circumstances of their pregnancy as a condition of obtaining a previability abortion.

**RESPONSE:** State Defendants do not dispute that H.B. 136 bans elective abortions after 18 weeks LMP. State Defendants also do not dispute that another provision of Utah law, not at issue in this case, allows a woman who is pregnant as a result of rape to obtain an abortion at any point after 18 weeks LMP, including after viability, provided the physician who performs the abortion first verifies that the rape has been reported to law enforcement.[153]

60.    Patients who are unable to obtain an abortion due to HB 136's 18-week ban will suffer the deprivation of their fundamental right to determine when and whether to have a child or to add to their existing families, as well as the physical, emotional, and financial consequences of carrying a pregnancy to term against their will.

**RESPONSE:** Disputed. H.B. 136 does not violate controlling precedent that recognizes a right to an abortion.

## ARGUMENT

### I.    Standard of Review

#### A.  Standard of Review for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[154] "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[155] If the movant carries this initial burden, the nonmovant . . . may not simply rest upon its pleadings; the burden

---

[153] *See* Utah Code § 76-7-302(3)(b)(iii).
[154] Fed. R. Civ. P. 56(a).
[155] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998).

shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[156]

### B. Applicable Precedent in Abortion Jurisprudence

In addition to *Roe*, *Casey*, *Bangerter*, and *Gonzales* (discussed in the Introduction), the Court must consider two further cases that flesh out how to apply the undue burden test when reviewing a state's abortion regulations: *Whole Woman's Health v. Hellerstedt*[157] and *June Medical Services, L.L.C. v. Russo*.[158]

In 2016, the Supreme Court issued an opinion in *Whole Woman's Health* invalidating a Texas law that required abortion providers to have admitting privileges with local hospitals.  In doing so, the Court held that *Casey* required "courts [to] consider the burdens a law imposes on abortion access together with the benefits those laws confer."[159] However, just this past summer, the Supreme Court was again called upon to apply *Casey*'s undue burden standard in *June Medical*–a case involving a Louisiana hospital-admitting privileges law similar to that at issue in *Whole Woman's Health*. There, a four member plurality, relying on *Whole Woman's Health*, applied a balancing test to invalidate the Louisiana law.[160]  Four other members of the Court would have either upheld the Louisiana law or remanded the case for further proceedings.[161]

However, the fifth vote to invalidate the Louisiana law at issue in *June Medical* was provided by Chief Justice Roberts. Although voting to strike down the Louisiana law under

---

[156] *Id.* at 671.
[157] *Whole Woman's Health*, 136 S. Ct. 2292 (2016).
[158] *June Medical Services, L.L.C. v. Russo*, 140 S. Ct. 2103 (2020).
[159] *Whole Woman's Health*, 136 S. Ct. at 2309.
[160] *June Medical*, 140 S. Ct. at 2113.
[161] *Id.* at 2142-82.

principles of *stare decisis*, Chief Justice Roberts parted ways with the plurality on the appropriate test to apply. Specifically, Chief Justice Roberts rejected the notion that *Casey* "suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts."[162] Instead, "the 'traditional rule' that 'state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty' is 'consistent with *Casey*.'"[163] According to the Chief Justice, an abortion-related law's asserted "benefits" are relevant only "in considering the threshold requirement that the State have a 'legitimate purpose' and that the law be 'reasonably related to that goal.'"[164] "So long as that showing is made, the only question for a court is whether a law has the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"[165]

Because no opinion in *June Medical Services* garnered a majority, a lower court has the "vexing task" of deciding which opinion controls.[166] In this situation, the Supreme Court has instructed lower courts to treat the "position taken by [the Justice or Justices] who concurred in the judgment[] on the narrowest grounds" as "the holding of the Court."[167] This Court, then, "must follow the reasoning of the concurring opinion with the narrowest line of reasoning" that is "capable of supporting the Court's judgment in that case."[168]

In a fractured decision where two opinions concur in the judgment, an opinion will be the narrowest under *Marks* if the instances in which it would reach the same result in future cases

---

[162] *Id.* at 2136.
[163] *Id.* (quoting *Gonzales*, 550 U.S. at 163).
[164] *Id.* at 2138 (quoting *Casey*, 505 U.S. at 878, 882).
[165] *Id.* (quoting *Casey*, 505 U.S. at 877).
[166] *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 133 (6th Cir. 1994).
[167] *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).
[168] *Grutter v. Bollinger*, 288 F.3d 732, 741 n.6 (6th Cir. 2002) (en banc), *aff'd*, 539 U.S. 306 (2003).

form "a logical subset" of the instances in which the other opinion would reach the same result.[169] This is so because in that subset of cases, a majority of the Court which issued the fractured decision would necessarily agree with the result.[170] When a fractured decision strikes down a law as unconstitutional, the narrowest opinion is the one whose rationale would invalidate the fewest laws going forward.[171]

In *June Medical*, because the Court invalidated the Louisiana statute at issue, the narrowest opinion concurring in the judgment is the one that would strike down the fewest laws regulating abortion in future cases. The Chief Justice read the rule laid down in the Court's precedents to say that laws not "reasonably related" to a "legitimate purpose" or that impose a "substantial obstacle" are unconstitutional.[172] All other laws regulating abortion, however, "are valid."[173] Like the Chief Justice, the plurality would invalidate any law with "the effect of placing a substantial obstacle in the path of a woman's choice" to obtain a previability abortion.[174] But the plurality would also invalidate any law where "the balance" between the law's benefits and its burdens "tipped against the statute's constitutionality."[175] Presumably, this would include some laws that are reasonably related to a legitimate purpose and that do not impose a substantial obstacle, so long as the law's burdens sufficiently outweighed its benefits.

Because all laws invalid under the Chief Justice's rationale are invalid under the plurality's, but not all laws invalid under the plurality's rationale are invalid under the Chief

---

[169] *U.S. v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009)(quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).

[170] *See Triplett Grille*, 40 F.3d at 134.

[171] *See, e.g., Memoirs v. Massachusetts*, 383 U.S. 413 (1966).

[172] *June Medical*, 140 S. Ct. at 2138 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878, 882).

[173] *Id.* at 2138 n.2.

[174] *Id.* at 2120 (plurality opinion) (quoting *Whole Woman's Health*, 136 S. Ct. at 2309).

[175] *Id.*

Justice's, the Chief Justice's position is the narrowest under *Marks*. His concurrence therefore constitutes *June Medical*'s holding and provides the governing standard here.[176]

Under the Chief Justice's controlling opinion, a law regulating abortion is valid if it satisfies two requirements. First, it must be "'reasonably related' to a legitimate state interest."[177] Because courts must apply "the 'traditional rule'" of deference to the state's "medical and scientific" judgments,[178] this requirement is met whenever a state has "a rational basis to . . . use its regulatory power."[179] Here, the State meets the threshold requirement because it has legitimate state interests that have been recognized by the Supreme Court. These interests include protecting the life of the unborn, protecting maternal health, and safeguarding the ethics of the medical community. For reasons discussed in Part III, H.B. 136 is reasonably related to these interests. The Court may not second-guess the State's established interests, and may not weigh the benefits of H.B. 136 against its purported burdens.

---

[176] *See Grutter*, 288 F.3d at 741. Three circuit courts have already addressed the question of which opinion in *June Medical* is controlling. Two of them, the Sixth and the Eighth, have found Chief Justice Roberts' opinion to be controlling. *See EMW Women's Surgical Center, P.S.C., et al, v. Friedlander*, --- F.3d ---, 2020 WL 6111008 (6th Cir., Oct. 16, 2020); *see also Hopkins v. Jegley*, 968 F.3d 912, 916 (8th Cir. 2020). The Fifth Circuit, however, found that *June Medical* "does not furnish a controlling rule of law on how a court is to perform" the undue burden analysis. *See Whole Woman's Health v. Paxton*, --- F.3d ---, 2020 WL 6218657 *4 (5th Cir., Oct. 13, 2020). The Fifth Circuit therefore turned to *Whole Woman's Health* for a controlling rule of law and applied the balancing test found therein. *Id.* (That case will now be reviewed en banc. *See Whole Woman's Health v. Paxton*, -- F.3d --, 2020 WL 6495383 (5th Cir. Oct. 30, 2020)). Even if the Court were to apply the balancing test argued for by two judges on the Fifth Circuit, the State would still prevail because the state's interest, particularly in protecting the unborn baby from pain, far outweighs any burden on the pregnant woman. For reasons set forth in the dissenting opinion in *Whole Woman's Health v. Paxton*, the State's interests outweigh the burden.

[177] *June Medical*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878 (joint opinion)).

[178] *Id.* at 2136 (quoting *Gonzales*, 550 U.S. at 163).

[179] *Gonzales*, 550 U.S. at 158.

Second, the law must not "ha[ve] the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"[180] For reasons set forth in Part III, H.B. 136 does not impose a substantial obstacle or undue burden on women seeking an abortion because, like the law at issue in *Gonzales*, it leaves in place a meaningful opportunity for a woman' to choose an abortion before viability.

## II.   HB 136 is Reasonably Related to the State's Recognized Legitimate Interests

### A.   *HB 136 is Reasonably Related to the State's Recognized Legitimate Interest in the Life of the Fetus*

Every applicable Supreme Court precedent addressing the right to an abortion recognizes that states have an interest in the life of the unborn child. In *Roe*, the Supreme Court said that states, "have an important and legitimate interest . . . in protecting the potentiality of human life."[181] Further, "It is reasonable and appropriate *for a State to decide that at some point in time* another interest, . . . that of potential human life, becomes significantly involved."[182] Not only does the state have a recognized, legitimate interest in the life of the unborn human being, but that interest exists "from the outset of pregnancy."[183] "[I]t must be remembered that *Roe v. Wade* speaks with clarity in establishing . . . the State's 'important and legitimate interest in potential life.' That portion of the decision in *Roe* has been given too little acknowledgment and implementation by the Court in its subsequent cases."[184] "The government may use its voice and its regulatory authority to show its profound respect for the life within the woman."[185]

---

[180] *June Medical*, 140 S. Ct. at 2138 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 877 (joint opinion)).
[181] *Roe*, 410 U.S. at 162.
[182] *Id.* at 159 (emphasis added).
[183] *Casey*, 505 U.S. at 846.
[184] *Casey*, 505 U.S. 833, 871 (1992).
[185] *Gonzales*, 550 U.S. at 157.

What does it mean to show "profound respect for the life within the woman?"  It means the Constitution does not require the State to turn a blind eye to: (1) the method of abortion Plaintiff exclusively uses after 18 weeks gestation in which the unborn human being has her limbs removed one by one with forceps and her skull crushed; or (2) credible scientific knowledge, unknown at the time of *Roe*, *Casey*, and *Bangerter*, that an unborn human being has the neural circuity to experience pain by 18 weeks gestation. To say that the State has an interest in the life of the unborn child from the outset of pregnancy, but then to prevent the State from taking action to minimize, if not eliminate, the instances of fetal pain caused by abortion providers, would render the State's interest essentially meaningless – existing on paper but not in reality. The Court should not do this. Rather, the Court should allow the State to act on its recognized interest – to express profound respect, through regulation, for the human life that is a fetus. The Supreme Court has recognized it is the role of the State, not the judiciary, to decide at what point in pregnancy the interest of the human life "becomes significantly involved."[186] Certainly, when a potential human life is capable of experiencing the pain associated with limb removal, then her interests have become "significantly involved."

In all medical fields except abortion, medical professionals are sensitive to the experience of pain in their patients and subjects – whether such patients and subjects are human or animal – and adopt measures to avoid or minimize the potential to experience pain. For example, fetal surgeons found that "when performing invasive medical procedures on [a] fetus . . . [i]t is necessary to apply adequate analgesia to prevent the suffering of the fetus."[187] This is true for

---

[186] *Roe*, 410 U.S. at 159 ("It is reasonable and appropriate *for a State to decide that at some point in time* another interest, . . . that of potential human life, becomes significantly involved")(emphasis added).

[187] Condic Expert Rep., State Defs.' App., ¶ 42 (State Defs.' App. 0087-0088).

fetuses much younger than 18 weeks.[188] Where execution of human beings is lawful, ethical concerns prohibit execution from being carried out through inhumane means.[189] Research animals must be euthanized in humane ways.[190] In the United Kingdom, even frogs and fishes are required by an Act of Parliament to be protected by anesthesia from possible suffering due to invasive procedures.[191] Certainly, the Constitution allows the State to show the same ethical regard toward human beings in utero as it does toward research animals.

The State contends that the science of fetal pain establishes that a fetus as young as 18 weeks LMP has developed the neural circuity necessary to experience pain. However, even if that science were in doubt, the State must be allowed to err on the side of humanity and human dignity, rather than callous indifference toward human life.[192] H.B. 136 is reasonably related to the State's recognized legitimate interest of protecting the life of the unborn "from the outset of pregnancy."[193]

    B. *HB 136 Furthers the State's Recognized Legitimate Interest in Protecting the Ethics of the Medical Profession in Utah*

As stated above, in all medical fields *except* abortion, medical providers are attentive to their own capacity to inflict pain on their patients through the use of their knowledge and skills.

---

[188] *See id.*, n. 61.

[189] Curlin Expert Rep., State Defs.' App., ¶ 44 (State Defs.' App. 0104-0105).

[190] *Id.*

[191] Condic Expert Rep., State Defs.' App., ¶ 48 (State Defs.' App. 0090).

[192] At least one court has discounted the notion that a fetus can experience pain prior to 18 weeks. *See Whole Woman's Health v. Paxton*, -- F.3d --, 2020 WL 6218657 (5th Cir. Oct. 13, 2020). However, that case is now slated for en banq review. *See Whole Woman's Health v. Paxton*, -- F.3d --, 2020 WL 6495383 (5th Cir. Oct. 30, 2020). Further, the judiciary is required to give "wide discretion" to the legislature when it comes to areas of scientific uncertainty. The judiciary should not second-guess or overrule legislative judgments about whether a fetus is capable of experiencing pain. Based upon the available scientific evidence, a legislature may reasonably conclude that a fetus is capable of experiencing pain by 18 weeks.

[193] *Casey*, 505 U.S. at 846.

In the field of abortion, however, Plaintiff's own abortion provider testified that he was "not

certain" whether a fetus could experience pain at "any point prior to birth."[194] Plaintiff's lack of

interest in the question of whether a fetus can experience pain when having its limbs removed

one by one underscores the State's role in regulating the ethics of the medical profession. The

Supreme Court has repeatedly recognized the right of the State to regulate the ethics of the

medical profession. The Court in *Roe* said, "Of course, important state interests in the areas of

health and medical standards do remain."[195] Further, "[t]here can be no doubt the government has

an interest in protecting the integrity and ethics of the medical profession."[196]

The Hippocratic Oath marked a watershed in the history of humankind.  As Margaret

Mead observed:

> For the first time in our tradition there was a complete separation between
> killing and curing . . . [T]his is a priceless possession which we cannot
> afford to tarnish. . . . [S]ociety always is attempting to make the physician
> into a killer – to kill the defective child at birth, to leave sleeping pills beside
> the bed of the cancer patient. . . . [I]t is the duty of society to protect the
> physician from such requests.[197]

Physicians' commitment not to cooperate in killing has facilitated public trust in the

profession. The boundary against killing has guarded doctors against endemic temptations to use

their powers in unethical ways, and so facilitated the trust needed for vulnerable patients to give

themselves over to physicians' care when the patients are sick or injured.[198] However, when

physicians reorient themselves away from health, and especially when they participate in the

deliberate taking of human life such as a fetus, they facilitate the coarsening of professional

---

[194] Turok Dep., State Defs.' App.,  pp. 57, line 24 through p. 58, line 3 (State Defs.' App. 0058-0059).
[195] *Roe,* 410 U.S. at 149.
[196] *Gonzales*, 550 U.S. at 157 (internal quotation and citation omitted).
[197] *See* Curlin Expert Rep., State Defs.' App., ¶ 55 (State Defs.' App. 0108).
[198] *Id*., ¶ 56 (State Defs.' App. 0108-109).

attitudes toward the vulnerable.[199] This attitude has previously led to practices such as not caring for neonates with Down Syndrome or other congenital conditions.[200]

The transformation of physicians from healers into technicians by shifting medicine's traditional ethic to a new provider-of-services model, has led to moral detachment by clinicians.[201] This detachment from making ethical judgments is a very recent development in the medical profession. It allows the provider of abortion to avoid the question of whether killing the fetus is justified.[202]

This moral and ethical detachment is perhaps best illustrated by the testimony of Plaintiff's abortion doctor in Utah. Dr. David Turok demonstrates indifference at best, and callous disregard at worst, toward human life not only with respect to fetal pain, but in other ways. For example, Dr. Turok does not draw a "hard and fast line" in gestational development beyond which he would perform an abortion.[203] He does not have a moral objection to an abortion being performed at nine months of pregnancy, but would not perform the procedure himself "due to gestational size."[204] He would perform an abortion even if the abortion was sought because the unborn baby was handicapped, a girl, or a particular race, stating it is not his job "to assess the reasons for people having an abortion."[205]

The moral detachment that accompanies abortion, and the corollary emphasis on setting aside one's personal judgment in favor of providing what people want, has contributed to an

---

[199] *Id.*, ¶ 60 (State Defs.' App. 0110).
[200] *Id.*, ¶ 61 (State Defs.' App. 0110).
[201] *Id.*, ¶ 58 (State Defs.' App. 0109) .
[202] *Id.*, ¶ 59 (State Defs.' App. 0109-0110).
[203] Turok Dep., State Defs.' App., p. 34, line 20 though p. 35, line 1 (State Defs.' App. 0035-0036).
[204] *Id.*, p. 34, lines 6-20 (State Defs.' App. 0035).
[205] *Id.*, p. 32, lines 3-25 (State Defs.' App. 0033).

epidemic of de-moralization and burnout among physicians.[206] Physicians have become
conditioned to what the sociologist Peter Berger called "moralized anonymity."[207] Providing
abortions has conditioned physicians to say what Dr. Turok testifies to in his deposition – that he
cannot say what is right in a given situation.[208] Sociologist Jonathan Imber notes that Americans
once viewed medicine as a "sacred vocation," but trust in the profession has steadily declined as
clinicians have become "more valued for their technical competence than for their noble
character."[209] The moral detachment demonstrated by Dr. Turok is behavior that has contributed
to the declining public trust in the profession.[210] Morally detached physicians "cannot be trusted
to care for us when we are too weak and frail and dependent to care for ourselves."[211]

      H.B. 136 helps to defend against further ethical disintegration of the medical profession,
and further erosion of the public trust without which physicians cannot effectively do their
important work.[212] By regulating abortion after 18 weeks LMP when a fetus is capable of pain
and when the humanity of the fetus is "manifestly obvious even to a layperson,"[213] H.B. 136
bolsters the ethical integrity of the medical profession and public trust in it.[214]

     *C. H.B. 136 Furthers the State's Interest in Protecting the Health of the Pregnant*
        *Woman*

     As with the State's other recognized interests, the Supreme Court has repeatedly affirmed
that the State "has a legitimate interest in seeing to it that abortion, like any other medical

---

[206] Curlin Expert Rep., State Defs.' App., ¶ 64 (State Defs.' App. 0111-0112).
[207] *Id.*
[208] *Id.*; *see also* Turok Dep., State Defs.' App., p. 32, lines 3-25 (State Defs.' App. 0033) .
[209] Curlin Expert Rep., State Defs.' App., at ¶ 66 (State Defs.' App. 0112).
[210] *Id.*
[211] *Id.*
[212] *Id.* at ¶ 54 (State Defs.' App. 0108).
[213] *Id.* at ¶ 40 (State Defs.' App. 0104).
[214] *Id.* at ¶ 66 (State Defs.' App. 0112).

procedure, is performed under circumstances that insure *maximum* safety for the patient."[215] The State has a "legitimate interest in maternal health. . . ."[216] *Gonzales* explains that the State has a "legitimate interest *from the outset of pregnancy* in protecting the health of the woman."[217] Further, the Supreme Court has recognized, like the experts for both Plaintiff and the State in this case, that "the risk to the woman increases as her pregnancy continues. Thus, the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy."[218]

Maternal mortality increases with gestational age at the time of abortion.[219] The frequency of complications from abortion increases in later gestational ages due to inherently greater technical complexity related to the anatomical and physiologic changes that occur as pregnancy advances.[220] CDC researchers found that the risk of death increased by 38% past the baseline for each additional week beyond 8 weeks.[221] Numerous studies, performed after the Supreme Court's decision in *Casey*, confirmed abortions become more life threatening to the mother as the pregnancy advances.[222] As pregnancy proceeds and the development of the fetus progresses, abortion-related risks to the psychological well-being of the mother increase substantially.[223] A woman's risk of adverse psychological consequences is exacerbated as the fetus develops and abortions occur at later gestational points in pregnancy.[224] Doctors and other abortion clinic

---

[215] *Roe*, 410 U.S. at 150 (emphasis added).
[216] *Casey*, 505 U.S. at 969.
[217] *Gonzales*, 550 U.S. at 145 (emphasis added).
[218] *Roe*, 410 U.S. at 151.
[219] Calhoun Expert Rep., State Defs.' App., p. 4 (a) (State Defs.' App. 0161).
[220] *Id.* at ¶ 42 (State Defs.' App. 0171).
[221] *Id.* at ¶ 43 (State Defs.' App. 0171-0172).
[222] *Id.*
[223] Coleman Expert Rep., State Defs.' App. ¶ 7 (State Defs.' App. 0273).
[224] *Id.* at ¶ 9 (State Defs.' App. 0274).

personnel may also experience increased stress and traumatic responses for abortions performed later in pregnancy, as fetuses develop and their human features become undeniable.[225]

By preventing elective abortions after 18 weeks LMP, H.B. 136 compels pregnant women, most of whom are aware they are pregnant by 12 weeks of gestational age,[226] to procure an abortion (if they are going to get one) *before* 18 weeks when there are likely to be fewer complications, both physiologically and psychologically, to maternal health. H.B. 136 is thus reasonably related to the legitimate State interest of protecting maternal health, while still allowing the pregnant woman a meaningful opportunity to obtain an abortion.

### III.    H.B. 136 Does Not Pose an Undue Burden on a Woman's Right to Choose

Under *Roe* and *Casey*, viability was an important milestone of pregnancy for abortion jurisprudence. The Supreme Court held that "viability marks the earliest point at which the State's interest in fetal life is constitutionally adequate to justify a legislative ban on nontherapeutic abortions."[227] For that reason, the Tenth Circuit invalidated a Utah law prohibiting abortion at 20 weeks (as measured from gestation) in 1996.[228] If the Supreme Court's abortion jurisprudence in 2020 were the same as it was in 1992, then the State concedes that H.B. 136 would violate precedent. However, the Supreme Court's abortion jurisprudence is not the same; the Court recalibrated the undue burden test in *Gonzales v. Carhart.*

In *Gonzales*, the Court considered a federal ban on intact dilation and evacuation, or "partial birth abortion" – whether that procedure was performed pre- or post-viability. In

---

[225] *Id*. at ¶ 7 (State Defs.' App. 0273).

[226] *See* Turok Dep., State Defs.' App., p. 58, line 19 through p. 59, line 1 (State Defs.' App. 0059-0060).

[227] *Casey*, 505 U.S. at 860.  Yale Law School professor and Stanford Law School Dean John Hart Ely harshly criticized the Supreme Court's decision to choose viability as the "magic moment."  *See* John Hart Ely, *The Wages of Crying Wolf*, 82 Yale L.J. 920, 924-26 (1973).

[228] *See Bangerter*, 102 F.3d 1112.

upholding the ban, *Gonzales* changed the way the undue burden test is applied and clarified that viability is not a bright line before which a state may not venture to ban abortion, especially where there is medical and scientific uncertainty.[229] Rather, as medical knowledge grows – especially knowledge related to fetal development, including a fetus's capacity to experience pain – governments are permitted to express their "profound respect for life within the woman," even when such life is pre-viable.[230] *Gonzales* does *not* say that pre-viability abortion bans are unconstitutional *per se*. Rather, it says that before "viability, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy."[231] H.B. 136 does not prohibit pregnant women from making the *ultimate* decision to terminate pregnancies pre-viability because it leaves in place a meaningful opportunity for a woman to choose an elective abortion, so long as she does so before 18 weeks gestation – a point in gestational development when an unborn human being can experience pain and when potential complications from abortion are rising.

In *Gonzales*, the Court also recognized that the "conclusion that the Act does not impose an undue burden is supported by other considerations," including alternatives to the partial birth abortion procedure.[232] It is not entirely clear whether the existence of alternative procedures was essential to the Court's judgment in *Gonzales*, but even if it were, such a consideration speaks to the Court's concern that a pregnant woman be afforded the opportunity to have an abortion pre-viability. H.B. 136 thus comports to *Gonzales* because it, too, leaves in place the opportunity for

---

[229] *Id.* at 163.
[230] *Id.* at 157.
[231] *Gonzales*, 550 U.S. at 146.
[232] *Id.* at 164.

a woman to have an abortion pre-viability, so long as such a choice is made before 18 weeks of pregnancy when an unborn baby can experience the pain of dismemberment.

Justice Ginsburg, dissenting in *Gonzales*, perceptively pointed out that the decision "blur[red] the line, firmly drawn in *Casey*, between pre-viability and post-viability abortions."[233] She was correct. In this case, Plaintiff ignores *Gonzales* and the important change it brought to abortion jurisprudence. Plaintiff's interpretation of H.B. 136 might have carried the day in a pre-*Gonzales* world, but not in a post-*Gonzales* one. Because H.B. 136 preserves a meaningful opportunity for a woman to choose an abortion, while simultaneously respecting the human dignity of an unborn child and protecting women from potential physical and psychological complications of late-term abortions, it does not violate precedent and is constitutional.

## IV.    Plaintiff Lacks Article III and Third-Party Standing.

An additional reason exists for denying Plaintiff the relief it seeks – Plaintiff lacks standing to assert constitutional claims on behalf of its patients. The judicial power is limited to cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process.[234] One of the traditional limitations of the case or controversy requirement is that the particular parties before the court invoke claims that are really theirs to control. Here, Plaintiff asserts a constitutional claim belonging not to itself, but to others – women who desire an abortion after 18 weeks gestation. However, there is no reason pregnant women cannot assert these claims themselves, as they did in *Roe* and its companion case, *Doe v. Bolton*.[235]

None of the other requirements for third-party standing have been met. To be certain, the Supreme Court held that the abortion providers in *June Medical* had standing to assert

---

[233] *Id.* at 171.
[234] *See* U.S. Const., Art. III.
[235] *Doe v. Bolton*, 410 U.S. 179 (1973).

constitutional claims on behalf of their patients.[236] But the abortion providers in that case were challenging admitting privileges regulations "that regulated their conduct" and thus they were "better positioned than their patients to address the burdens of compliance."[237] Women who desired an abortion would not have had any reason to challenge the law because it did not affect them directly. Here, however, pregnant women who desire an abortion after 18 weeks are capable of challenging the law. Thus, Plaintiff need not stand in their place.

Further, Plaintiff cannot assert third-party standing because conflicts of interest exist between Plaintiff and the women it purports to represent. A litigant cannot assert a third-party's rights when the interests of the litigant and the third-party conflict.[238] As a medical clinic, Plaintiff has a monetary interest in performing abortions for women at any gestational age. Women seeking an abortion, by contrast, have an interest in protecting their health, which involves increasing physical and psychological risks for each additional week beyond eight weeks gestation. Based on these conflicts, Plaintiff cannot assert these women's abortion rights.

## CONCLUSION

When Congress passed and the states ratified the Fourteenth Amendment, they recognized the inherent dignity of all human beings, especially the most vulnerable human beings in the country at that time – recently freed slaves. The Fourteenth Amendment repudiated the theory articulated in *Dred Scott*[239] that some human lives – in that case, descendants of Africans – were less valuable than other human lives. The Fourteenth Amendment reinforced the

---

[236] *June Medical*, 140 S. Ct. at 2118-19.
[237] *Id.* at 2119.
[238] *See Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 15 (2004).
[239] *Dred Scott v. Sandford*, 60 U.S. 393, 406 (1857)("It is very clear, therefore, that no State can, by any act or law of its own, passed since the adoption of the Constitution, introduce a new member into the political community created by the Constitution of the United States").

constitutional value that vulnerable groups and individuals are deserving of governmental protection, by virtue of their humanity. Here, H.B. 136 promotes the values embodied in the Fourteenth Amendment. It protects the weakest, frailest, and most vulnerable group – unborn human beings – from the intense physical pain that accompanies dismemberment. And it does so based upon the most recent scientific knowledge of fetal development.

Plaintiff interprets the Supreme Court's abortion jurisprudence as being static since 1992. It also interprets Supreme Court precedent as framing abortion in a way that one law professor characterizes as a "zero-sum conflict between isolated strangers, one of whom is recognized as [a] person, with the other deemed a sub-personal being whose moral and legal status is contingent upon the private judgment of others."[240]  It is true that the Supreme Court showed little regard for the experience of the unborn human in *Roe* and *Casey*. This all changed, though, with the Court's decision in *Gonzales* in 2007. There, the Court, perhaps for the first time, recognized the humanity of the unborn and recognized the power of government to protect that human life, even pre-viability.  "The Act expresses respect for the dignity of human life."[241] Further, "[n]o one would dispute that, for many, D & E is a procedure itself laden with the power to devalue human life."[242]  Most importantly, the *Gonzales* Court found that the "government may use its voice and regulatory authority to show its profound respect for the life within the woman."[243]

The *Roe* and *Casey* Courts did not investigate actual abortion procedures and did not take into consideration the harm to human dignity that post 18-week D&E entails. The *Gonzales*

---

[240] *See* O. Carter Snead, What it Means to Be Human: The Case for the Body in Public Bioethics 270 (2020).
[241] *Gonzales*, 550 U.S. at 157.
[242] *Id.* at 158.
[243] *Id.* at 157.

Court did, however, investigate the reality of both the intact D&E procedure and the D&E procedure, even previability, and then "blur[red] the line" of viability. That is why *Gonzales* is essential to the Court's analysis. The *Roe* and *Casey* Courts also did not have access to modern scientific literature on fetal pain – something available to state legislatures today.

There is nothing in the Constitution or Supreme Court precedent that require states to stand idly by and ignore the harm to human dignity entailed in Plaintiff's post-18 week abortion procedure.  Accordingly, the Court should deny summary judgment to Plaintiff and grant summary judgment to the State.

**DATED:**  November 16, 2020.

OFFICE OF THE UTAH ATTORNEY GENERAL


/s/ *Lance Sorenson*
LANCE SORENSON
DAVID N. WOLF
*Counsel for State Defendants*

57

## CERTIFICATE OF SERVICE

I certify that on **November 16, 2020**, I electronically filed the foregoing, **STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**, using the Court's electronic filing system and I also certify that a true and correct copy of the foregoing was sent by email and United States mail, postage prepaid, to the following:

John Mejia
AMERICAN CIVIL LIBERTIES UNION
OF UTAH FOUNDATION, INC.
355 N. 300 W.
Salt Lake City, UT 84103
jmejia@acluutah.org

Jennifer Sandman
Hana Bajramovic
PLANNED PARENTHOOD
FEDERATION OF AMERICA
123 William Street, 9th Floor
New York, NY 10038
jennifer.sandman@ppfa.org
hana.bajramovic@ppfa.org

Julie Murray
Hannah Swanson
PLANNED PARENTHOOD
FEDERATION OF AMERICA
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
julie.murray@ppfa.org
hannah.swanson@pfa.org

Darcy Goddard
OFFICE OF THE SALT COUNTY
DISTRICT ATTORNEY
35 East 500 South
Salt Lake City, Utah 84111
dgoddard@slco.org

*/s/ Genevieve De La Pena*
Legal Assistant
Attorney General's Office

58